IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 3, 2017

## IN RE MICHAEL B., JR., ET AL

**Appeal from the Juvenile Court for Washington County**
**No. 46-509, 46-510  Sharon M. Green, Judge**

_____

## No. E2017-00486-COA-R3-PT

_____

The trial court found clear and convincing evidence to terminate Mother's parental rights to her two children on the grounds of abandonment by failure to establish a suitable home, substantial noncompliance with permanency plans, and persistence of conditions. The trial court also found clear and convincing evidence that termination was in the children's best interest. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

J. STEVEN STAFFORD, P.J.,W.S., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and ANDY D. BENNETT, J., joined.

Holly L. Booksh, Johnson City, Tennessee, for the appellant, Felicia A.

Herbert H. Slatery, III, Attorney General and Reporter; W. Derek Green, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

### Background

On December 23, 2015, Petitioner/Appellee the Tennessee Department of Children's Services ("DCS") filed a petition to terminate the parental rights of Felicia A. ("Mother") to her children, Michael B. and Melody B.,[1] born in 2003.[2] The petition alleged that the juvenile court had entered an order awarding DCS temporary legal custody of the children on January 7, 2015 and subsequently found the children to be

_____

[1] In cases involving termination of parental rights, it is the policy of this Court to remove the names of minor children and other parties in order to protect their identities.

[2] The children's father surrendered his parental rights and is not at issue in this appeal.

dependent and neglected by order of March 16, 2015. The petition alleged grounds of abandonment by failure to establish a suitable home, substantial noncompliance with permanency plans, and persistence of conditions.

The trial court thereafter appointed a guardian ad litem for the children and an attorney for Mother. On June 2, 2016, Mother filed a response in opposition to the termination petition. A trial took place over three days in December 2016 and January 2017. Two permanency plans drafted by DCS, agreed to by Mother, and ratified by the trial court were entered as exhibits. The first plan, created and ratified in April 2015, required that Mother: (1) complete a clinical parenting assessment, inform DCS of the results, follow all recommendations, and provide documentation of any completion of recommendations to DCS; (2) attend visitation and display "learned parenting skills"; (3) complete a psychological assessment, share the results with DCS, follow all recommendations, and provide documentation of any completion of recommendations to DCS; (4) complete an alcohol and drug assessment, inform DCS of the results, follow all recommendations, and provide documentation of any completion of recommendations to DCS; (5) complete intensive outpatient alcohol and drug treatment and follow any recommendations from any drug treatment program; (6) submit to random drug screens; (7) obtain legal income or government assistance to provide for the children; (8) obtain documentation regarding any medical issues that would prevent employment; (9) seek help from DCS to apply for disability; and finally, (10) participate in homemaker services provided by DCS and provide a safe and clutter-free home for the children. A second parenting plan was created in August 2015 and ratified in October 2015. This plan generally contained the same requirements for Mother, with the addition of obtaining additional mental health, teen parenting, and anger management counseling.

Nine DCS workers, service providers, or therapists testified on behalf of DCS regarding their involvement with the family. First, Julie Lowry, a DCS investigator and former assessment worker, testified that Mother and the children first became involved with DCS in 2012, but that case was ultimately closed. The instant matter instead began in July 2014 when DCS received a referral regarding the condition of the family's home and the children not attending school due to having head lice. Throughout DCS's involvement, Mother lived in a home owned by Mother's father and later inherited by Mother.[3] Ms. Lowry conducted ten home visits of Mother's home between July 2014 and January 2015. During these visits, Ms. Lowry and other workers observed dog feces and garbage throughout the home, roaches and other bugs, mold, excessive clutter, gaps in the walls of the home, lack of food, and lack of heat in some places.

Another DCS worker visited the home after the removal of the children, Jessica Trivette. Of Ms. Trivette's ten attempted visits, Mother cancelled or was not present for

---

[3] As discussed in detail, *infra*, for a time in the summer of 2015, Mother lived with her sister or brother due to the condition of the home being unsuitable.

at least half of the visits.[4] Ms. Trivette testified that when she was able to view the home, its condition was largely unchanged, with some improvement that later "digressed." Indeed, it was undisputed at trial that the home currently had no working electricity.

The final DCS caseworker to be placed on this case, Diana McKamey, testified that she made eight unsuccessful attempts to inspect the home in 2016. Ms. McKamey made one successful home visit in September 2016; during this visit, the electricity in the home did not work and Ms. McKamey observed that the home was dirty, that there were "lots of bugs," and that old food was left on the porch of the home.

Much of the DCS workers' testimony concerned their inability to maintain contact with Mother. Over the course of the time of DCS's involvement, Mother had several telephone numbers and sometimes resided with her sister or brother for months at a time. DCS workers and service providers testified that they called and texted Mother's numbers, as well as the numbers for Mother's fiancé, father, and sister, often to no avail. On multiple occasions, DCS workers went to Mother's home. Because Mother was often not home,[5] they left notes for Mother. Sometimes, Mother would make contact with DCS following these attempts; sometimes Mother would not. Ms. Trivette testified that although Mother maintained consistent contact with her shortly following the removal of the children in January 2015, her ability to successfully contact Mother waned. As such, Ms. Trivette testified that she was completely unable to speak with Mother between April 28, 2015 and June 17, 2015, despite repeated attempts. Shortly before trial on the termination petition began, Ms. McKamey also testified that she struggled to reach Mother. When she did contact mother in November 2016 and made recommendations, Mother rebuffed Ms. McKamey's suggestions as "crap" that Mother did not need. Although Mother was informed that a family team meeting was taking place days before the trial in December 2016, Mother refused offers for transportation assistance and did not attend the meeting.

Several DCS workers also testified about Mother's drug abuse. Mother was administered a number of drug tests over the years of DCS's involvement. Although Mother sometimes passed drug tests, DCS workers testified that Mother failed drug screens both prior to the removal of the children and later in January 2015, April 2015, March 2016, and December 2016, variously for marijuana, oxycodone, lortab, amphetamines, cocaine, opiates, bonxoylecgonine, morphine, oxymorphine, oxycodone, and hydrocodone. Frequently, Mother also failed to report for scheduled drug testing. In October 2015 and March 2016, Mother admitted to using illegal drugs. Even at the time of trial at the end of January 2017, Mother admitted that she likely could not pass a drug

---

[4] Of the ten visits, Mother cancelled one visit, Mother was not home even though a visit was scheduled for two visits, and Mother was not home for three unscheduled visits.
[5] Interestingly, the DCS workers were often informed that Mother was out doing laundry when they called at the home. Mother testified at trial, however, that the home has laundry facilities.

test because she had used marijuana three weeks prior. Mother claimed to have prescriptions for some of the medications for which she tested positive, but DCS workers testified that they never received proof of the prescriptions and no documentation was submitted during trial to support Mother's claims.

In order to combat Mother's mental health and substance abuse issues, DCS provided Mother with several assessments, which were completed by Mother, and several treatment options, none of which had been successfully completed by the time of trial. After Mother's completion of an alcohol and drug assessment in April 2015, it was recommended that Mother attend intensive outpatient alcohol and drug treatment. Mother enrolled in a program in April 2015, but terminated her participation that summer stating that the program "was not for me." Mother also successfully completed a clinical parenting assessment in April 2015. A psychological assessment was scheduled for early April 2015, but Mother did not appear. The assessment was eventually completed in June 2015.

Pursuant to the recommendations from the assessments, DCS set up in-home alcohol and drug treatment services for Mother, beginning in August 2015. Mother was required to simply be home to receive the services when scheduled. Despite this minimal effort required of Mother, Mother was home to complete services only for four out of ten scheduled services. As such, the service provider testified that Mother made no significant progress. These services were terminated in September 2015 due to Mother's noncompliance. Although services were reauthorized by DCS in September 2016—this time to be completed inpatient—the service provider testified that he was unable to obtain contact with Mother to initiate the services. Mother testified that her failure to complete services with this provider related to her dislike of the service provider, who she claimed attempted to perform services at inappropriate times and locations.

DCS also referred Mother to three different inpatient drug treatment programs after Mother admitted to relapsing in October 2015. DCS first referred Mother to the Magnolia Ridge treatment program where Mother was placed on the waiting list. At trial, Mother claimed to still be on the waiting list even though years had passed. When asked what effort Mother had made to attend treatment at Magnolia Ridge, Mother admitted that she had not really thought about it for some time. In the same month, Mother left a second treatment program, scheduled to take at least twelve days to complete, after two days due to medical issues; Mother never returned. Mother claimed that she attempted to return but was unable to do so because there was a miscommunication regarding her transportation. After this missed attempt, however, it does not appear that Mother made another effort to return to this program. Mother blamed her failure to make additional effort to return on the death of her father, which occurred approximately two months later in January 2016. As previously discussed, DCS authorized Mother's attendance at another inpatient program in September 2016, but Mother missed her first appointment

and thereafter failed to reschedule the appointment or otherwise maintain contact with the service provider.

Due to the issues with Mother's home, DCS also provided Mother with homemaker and parenting services through Foundations for Life Principles, beginning in April 2015. Rebecca Roosa, who began working with Mother in September 2015, testified that her purpose was to help Mother with cleaning and de-cluttering the home, managing medications, applying for jobs, obtaining transportation or learning to use public transportation, filing for disability benefits, going to mental health appointments, and helping Mother regain electricity in the home. Foundations for Life also provided Mother with parenting education. In order to receive these services, Mother only had to be available in her home. Nevertheless, Mother often missed appointments and Ms. Roosa was unable to maintain consistent contact with Mother. Foundations for Life services were eventually terminated in December 2015 based on Mother's noncompliance.

At trial, Mother testified that her substance abuse issues stemmed from mental issues related to grief and stress. Mother denied, however, that she was "self-medicating." Mother identified several stressful events during the course of DCS's involvement in this case, including: (1) the death of Mother's sister in February 2015; (2) the death of Mother's father in January 2016; (3) Mother's unplanned pregnancy in the spring of 2016; and (4) the death of Mother's infant in September 2016. According to Mother, she had not had time to grieve the death of her child and she was unable to make progress due to the stressful events in her life. At the time of trial, Mother testified that she had recently enrolled in motivational and parenting classes and had begun case management at a mental health facility. Mother testified, however, that she had attended only a single class at the time of her testimony.

Mother indicated that she was not currently employed and that at the time of the final day of trial, over four months had passed from the death of her child, with very little progress made on the tasks required to be completed by Mother. Mother stated that she suffered from a serious condition often affecting her health, but did not testify that this condition made her unable to maintain employment. Indeed, Mother testified that she had worked for approximately one month at a fast food restaurant and that she was planning to begin working at another restaurant soon. Mother admitted that her home currently had no electricity and indeed had not had working electricity as early as May 2016. Around May 2016, Mother testified that she became aware that she pregnant unexpectedly, which caused her some mental health issues. Due to the pregnancy and the lack of electricity, Mother spent considerable time in the summer of 2016 living with her brother or sister. At this time, DCS workers had difficulty contacting Mother. Mother testified, however, that she was home approximately three nights per week and that she informed DCS of her temporary move, albeit later in the summer of 2016. Mother also stated that she would

be able to turn on the electricity in the home once she received her tax return in early 2017.

With regard to income at the time of trial, Mother testified that she sometimes works as a care-giver for adults and that her fiancé works as well. Additionally, prior to his death, Mother testified that her father helped her financially. Mother admitted that despite being required to do so in the permanency plan, she had not paid child support for the children.

Mother testified that she consistently attended visitation until the terms were changed making it more difficult to schedule the visits. At trial, the evidence showed that other than a few missed or rescheduled visitations, Mother had visited with the children often and typically consistently. Mother and those who witnessed visitation both testified that Mother had a strong and loving bond with the children. A service provider who witnessed visitation testified that Mother sometimes brought others to the visitation, but stopped this behavior when asked. The service provider also testified that Mother sometimes spoke of topics such as the litigation and was required to be redirected. The service provider admitted, however, that often the children had to be redirected from certain topics as well. Based solely on the visits, the service provider provided Mother with periodic progress reports indicating that there were no safety issues that would prevent reunification. The service provider also testified that there was no impediment to unsupervised visitation with the children should the termination petition not be granted.

The children's therapists and foster mother both testified about the children's progress after their removal. The children's therapists both testified that the children were making progress, but still had issues that required consistent therapy. Michael's therapist indicated that his need for stability was great and that he needs things to be settled with Mother "one way or the other." Melody's therapist testified that she suffers from stress related to being removed from her biological family and that her treatment focuses on accepting the circumstances as they are. Although Melody was only placed in therapy after the removal, Mother had engaged a therapist for Michael while he was still in her custody to treat his attention deficit hyperactivity disorder.

The children's therapeutic foster mother testified that she was trained to provide additional in-home therapeutic care for the children. Although there had been an issue with Michael's behavior that had caused the children to be removed from foster mother's care for a time, the children had returned to foster mother's care, in part because the children wanted to return. Foster mother testified that the children were making improvements and that her family was open to adopting the children should termination be granted. Foster mother testified that the children are doing well and making improvements, but that they are disappointed when Mother misses scheduled telephone calls or is distracted by other individuals during the phone calls. At least once, foster mother testified that she believed Mother to be under the influence during a phone call.

At the conclusion of trial, the trial court orally ruled in favor of DCS. Thereafter, on February 9, 2017, the trial court entered a detailed and thorough order finding that DCS had established clear and convincing evidence of Mother's failure to establish a suitable home, Mother's substantial noncompliance with permanency plans, and persistence of conditions. The trial court likewise found clear and convincing evidence that termination was in the children's best interests.

## Issues Presented

Mother raises four issues in this case, which we summarize:

1. Whether the trial court erred in finding clear and convincing evidence that grounds existed to terminate Mother's parental rights.
2. Whether the trial court erred in finding clear and convincing evidence that termination was in the children's best interest.

## Analysis

According to the Tennessee Supreme Court:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female child*, 896 S.W.2d 546, 547–48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as parens patriae has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 522–23 (Tenn. 2016) (footnote omitted).

Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)). A person seeking to terminate parental rights must prove both the existence of

one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769. Consequently, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id.* at 653.

As our supreme court opined:

> The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d [387,] 393 [(Tenn. Ct. App. 2009)] (quoting *In re Adoption of A.M.H.*, 215 S.W.3d [793], 810 [(Tenn. 2007)]). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*Carrington H.*, 2016 WL 819593, at *12.

When the resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues. *See McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997).

**Grounds for Termination**

The trial court found three grounds for terminating Mother's parental rights: (1) abandonment by failure to establish a suitable home pursuant to Tennessee Code Annotated section 36-1-102(1)(A)(ii); (2) persistence of conditions pursuant to Tennessee Code Annotated section 36-1-113(g)(3); and (3) substantial noncompliance with the

permanency plans pursuant to Tennessee Code Annotated section 36-1-113(g)(2). We begin with abandonment by failure to establish a suitable home.

### Abandonment by Failure to Establish a Suitable Home

Pursuant to Tennessee Code Annotated section 36-1-113(g)(1), "[a]bandonment by the parent or guardian" constitutes a ground for termination of a parent's parental rights. Tennessee Code Annotated section 36-1-102, in turn, provides several definitions for abandonment. In this case, the petition alleged, and the trial court found, abandonment by failure to establish a suitable home under Tennessee Code Annotated section 36-1-102(1)(A)(ii). This section provides that abandonment may be found where:

> The child has been removed from the home of the parent or parents or the guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date.

*Id.* A suitable home "requires more than a proper physical living location." *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014) (quoting *State v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007)). "It requires that the home be free of drugs and domestic violence." *Id.*

Here, there is no dispute that the children were placed in DCS custody on January 7, 2015 and later found to be dependent and neglected. There also can be little dispute that Mother's home remains unsuitable for the children. According to Mother's own admission, it lacks basic necessities such as electricity. Indeed, Mother testified that she often could not stay in the home during her pregnancy due to the lack of electricity. As such, it appears largely uncontested that the children likewise cannot stay in the home in its current condition, despite Mother's testimony that some improvements were being made to the home.

Rather, Mother asserts that the trial court erred in finding that DCS made reasonable efforts to assist Mother with improving the home's condition in the four months following the children's removal. This Court has previously held that this ground for termination required clear and convincing proof that "DCS 'made reasonable efforts to assist [Mother] to establish a suitable home for the child[.]'" ***In re Josephine E.M.C.***, No. E2013-02040-COA-R3-PT, 2014 WL 1515485, at *19 (Tenn. Ct. App. Apr. 17, 2014) (quoting Tenn. Code Ann. § 36-1-102(a)(1)(A)). Pursuant to section 36-1-102(1)(A)(ii): "The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]" Therefore, DCS's "efforts do not need to be 'Herculean,' [but] DCS is required to use its 'superior insight and training to assist parents with the problems the Department has identified in the permanency plan, whether the parents ask for assistance or not.'" ***In re Isobel V.O.***, No. M2012-00150-COA-R3-PT, 2012 WL 5471423, at *8 (Tenn. Ct. App. Nov. 8, 2012) (quoting ***State, Dep't. of Children's Servs. v. Estes***, 284 S.W.3d 790, 800–801 (Tenn. Ct. App. 2008)). This Court has interpreted Tennessee Code Annotated section 36-1-102(1)(A)(ii) as directing that a reasonable efforts inquiry in this context be limited to an examination of the four-month period immediately following the child's removal from the home. *See, e.g.,* ***In re Riley C.***, No. M2015-00541-COA-R3-PT, 2016 WL 626058, at *8 (Tenn. Ct. App. Feb. 12, 2016); ***In re M.A.P.***, No. E2014-02413-COA-R3-PT, 2016 WL 369399, at *5 (Tenn. Ct. App. Jan. 29, 2016); ***In re Aaliyah E.***, No. E2015-00602-COA-R3-PT, 2016 WL 304627, at *6 (Tenn. Ct. App. Jan. 26, 2016). The relevant period in this case therefore spans January 8, 2015 to May 7, 2016.

Mother argues that because of DCS's storied involvement in this case, DCS should have known that Mother's "issues were not easily remedied." Rather than immediately engage services to help Mother, she notes that DCS's referrals largely did not begin until April 2015, more than two months after the children were removed. DCS does not dispute that there was some delay in providing necessary services to Mother, but asserts that some of the delay was attributable to communication issues with Mother and her decision to postpone assessments. Additionally, DCS asserts that its efforts, while somewhat delayed, were reasonable and constituted more effort than Mother expended to remedy the conditions that led to the removal of the children.

Here, the trial court found that DCS did make reasonable efforts to assist Mother in establishing a suitable home in the four months following the removal of the children. The trial court noted that Ms. Trivette, *inter alia*, attempted to locate a relative placement for the child, assisted Mother in scheduling an alcohol and drug assessment, attempted to maintain contact with Mother, helped Mother reconnect with a previous service provider, provided random drug screening to help Mother show that she was drug-free, made a referral for a psychological assessment and reminded Mother of the appointment, which Mother later missed and Ms. Trivette helped her reschedule, requested funding for a

clinical parenting assessment, which was completed within the four-month period, made a referral for homemaking services to assist Mother with remedying the conditions in her home, conducted home visits to determine Mother's progress, notified Mother of appointments for the children, and ensured that the children's therapy remained near Mother's home so that she could attend the sessions. In contrast, the trial court found that Mother made no real effort to establish a suitable home for the children. During this time, Mother tested positive for illegal substances. Mother often missed scheduled appointments with service providers and telephone calls with the children. Although Mother was largely consistent with visitation with the children, DCS workers testified time and again that they were often unable to stay in contact with Mother. As such, the trial court found that

> 18. [W]hile not all of the recommendations of the assessments that were completed by [Mother] were returned during the four (4) months following removal, the reasonable efforts that were made by [DCS] during this four (4) month period were astronomical when compared to the minimal efforts made by [Mother] to improve her situation.
> 19. [Mother]'s failure to make even minimal efforts to improve her home and personal condition demonstrates a lack of concern for the children to such a degree that it appears unlikely that she will be able to provide a suitable home for the children at an early date.

The record on appeal supports the trial court's finding that despite DCS's reasonable efforts to assist Mother, she made no corresponding efforts to remedy her living situation. Here, Mother admits in her brief that Ms. Trivette, the DCS worker assigned to Mother during this time, spoke on the phone with Mother between January 7, 2015 and the end of February and met with Mother in her home one time at the end of February. Still, we concede that much of DCS's efforts came during the final months of the four-month period at issue. Nevertheless, in April 2015, DCS worked to assist Mother in obtaining necessary assessments and improving her home situation by placing homemaking services in the home with Mother. Clearly these efforts are far superior to other cases in which this Court found that no reasonable efforts were exerted by DCS. *In Isobel V.O.*, for example, we held that DCS failed to prove by clear and convincing evidence that it used reasonable efforts to assist parents with establishing a suitable home where the only effort DCS made with respect to housing was to provide them with a list of possible housing options. *In re Isobel V.O.*, 2012 WL 5471423, at *8. We have likewise found a lack of clear and convincing evidence of abandonment for failure to provide a suitable home where DCS "offered no evidence of efforts it made to help Mother obtain suitable housing at any time." *In re C.H.E.H.*, No. E2007-01863-COA-R3-PT, 2008 WL 465275, at *11 (Tenn. Ct. App. Feb.21, 2008). In this case, however, Ms. Trivette detailed a multitude of efforts expended to assist Mother in establishing a suitable home for her children. Ms. Roosa's homemaker services also began during the four-month period and included effort to assist Mother in cleaning the home, obtaining

disability benefits or employment, attending mental health appointments, and learning public transportation to remedy Mother's transportation issues.

During this time, however, Mother continued to abuse drugs and made no improvement to her living situation. Even at the time of trial, the home had no electricity and Mother admitted that she had recently used illegal drugs. At trial, Mother asserted that work was currently being done to the home. As such, it appears that Mother wishes to chastise DCS for a an approximate three month delay in securing services for her with her approximately two-year delay in making in substantial effort to make the home liveable. This Court has previously upheld a trial court's finding as to this ground even where DCS's efforts are delayed when some of the delay is attributable to lack of contact with the parent. *See In re Candace J.*, No. M2015-01406-COA-R3-PT, 2016 WL 944268, at *9 (Tenn. Ct. App. Mar. 11, 2016). In this case, Ms. Trivette testified to the multitude of efforts that DCS made during the four months following the removal of the children. Although these efforts largely began in the final two months, the Tennessee Legislature has clearly chosen to confine our review not to only the first two months after the removal, but the four months following removal. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii); *In re Riley*, 2016 WL 626058, at *8. The effort expended by DCS is therefore sufficient even though it occurred well into the four-month period at issue.

Mother also asserts that this ground is inapplicable where she was unable to complete the recommended programs required by the permanency plan in the four-month period following the removal of the children. Effort, rather than completion, is the proper metric with regard to this ground. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii) (discussing the parents "efforts"). As detailed above, Mother made minimal effort during the four-month period to establish a suitable home for the children, or at the very least, to maintain contact with DCS so that it could provide services to help her achieve this goal. Moreover, Mother failed to complete the required drug and alcohol program not only in the four months after the removal of the children, but also in the approximately two years since the children were removed from her home. The trial court's finding that the ground of abandonment by failure to establish a suitable home is therefore affirmed.

### Substantial Noncompliance

Next, the trial court found that Mother had substantially failed to comply with the permanency plans at issue. Tennessee Code Annotated section 36-1-113(g)(4) provides that a ground for termination exists where "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4[.]" Further, Tennessee Code Annotated section 37-2-403 provides, in relevant part:

> Substantial noncompliance by the parent with the statement
> of responsibilities provides grounds for the termination of

- 12 -

parental rights, notwithstanding other statutory provisions for termination of parental rights, and notwithstanding the failure of the parent to sign or to agree to such statement if the court finds the parent was informed of its contents, and that the requirements of the statement are reasonable and are related to remedying the conditions that necessitate foster care placement.

The determination of whether there has been substantial noncompliance with a permanency plan is a question of law, to be reviewed on appeal de novo with no presumption of correctness. *In re Valentine*, 79 S.W.3d 539, 548 (Tenn. 2002). Termination of parental rights under Tennessee Code Annotated section 36-1-113(g)(2) "requires more proof than that a parent has not complied with every jot and tittle of the permanency plan." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). To succeed under section 36-1-113(g)(2), DCS "must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d at 656–57 (citing *In re Valentine*, 79 S.W.3d at 547; *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003)). Second, DCS must show that "the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d at 657 (citing *In re Valentine*, 79 S.W.3d at 548–49; *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at * 12 (Tenn. Ct. App. June 3, 2003)).

Here, there is no dispute that the permanency plans in this case required Mother to: (1) complete a clinical parenting assessment, inform DCS of the results, follow all recommendations, and provide documentation of any completion of recommendations to DCS; (2) attend visitation and display "learned parenting skills"; (3) complete a psychological assessment, share the results with DCS, follow all recommendations, and provide documentation of any completion of recommendations to DCS; (4) complete an alcohol and drug assessment, inform DCS of the results, follow all recommendations, and provide documentation of any completion of recommendations to DCS; (5) complete intensive outpatient alcohol and drug treatment and follow any recommendations from any drug treatment program; (6) submit to random drug screens; (7) obtain legal income or government assistance to provide for the children; (8) obtain documentation regarding any medical issues that would prevent employment; (9) seek help from DCS to apply for disability; and finally, (10) participate in homemaker services provided by DCS and provide a safe and clutter-free home for the children. At trial, Mother testified that she was informed of the requirements of the plans and the consequences of her failure to comply with the plans' requirements. Having reviewed the plan, we affirm the trial court's finding that the requirements of the plan were reasonably related to the conditions that led DCS to remove the children.

The trial court found that with the exception of maintaining regular visitation with the children and completing assessments, Mother "has not completed any of the tasks set out for her in the permanency plans, such that she is in substantial noncompliance with the same." The evidence in the record supports the trial court's findings. Mother was generally present for visitation and attended the children's therapy sessions when appropriate. The record also shows that Mother did attempt to obtain disability benefits and completed three assessments: an alcohol and drug assessment, a mental health assessment, and a clinical parenting assessment. Although Mother completed these assessments, she generally failed to follow any of the recommendations that resulted. While Mother testified that her inability to complete alcohol and drug treatment or mental health treatment resulted from circumstances outside her control, for at least one type of alcohol and drug treatment, the only effort on Mother's part was to be home at scheduled times. Mother failed to make even this minimal effort and in-home drug and alcohol treatment was eventually terminated.

The permanency plans also required that Mother participate in in-home homemaking services. Again, despite the fact that all Mother was required to do was be present for the services, these services were eventually terminated due to Mother's noncompliance. With regard to the requirement that Mother participate in drug screening, various DCS workers testified that Mother was often difficult or impossible to contact to set up drug screens, that she failed to appear for some scheduled screenings, and that she failed some screenings. Indeed, Mother admitted that she sometimes failed or missed scheduled drug screens, did not currently have employment, had failed to substantially complete an intensive inpatient or outpatient drug treatment program, and had missed scheduled appointments with the homemaker services resulting in the termination of those services. In addition, Mother admitted that despite the homemaker services, her home was still cluttered and without electricity.

Although Mother made various excuses for her lack of completion of these tasks, again, our focus is not on whether Mother successfully met the goals of the permanency plan, but rather whether she made an effort to do so. When considering this ground for termination, "outcome achievement is not the measure of compliance[.]" *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *8 (Tenn. Ct. App. Mar. 2, 2009). "Our focus is on the parent's efforts to comply with the plan, not the achievement of the plan's desired outcomes." *In re Aiden R.*, No. E2015-01799-COA-R3-PT, 2016 WL 3564313, at *9 (Tenn. Ct. App. June 23, 2016) (no perm. app. filed); *see In re Heaven J.*, No. W2016-00782-COA-R3-PT, 2016 WL 7421381, at *10–11 (Tenn. Ct. App. Dec. 22, 2016) (holding that the evidence did not rise to the level of clear and convincing on the ground of substantial noncompliance when father made "considerable efforts and substantial progress" toward his tasks on the permanency plan); *Tenn. Dep't of Children's Servs. v. P.M.T. et al.*, 2006 WL 2644373, at *8 (Tenn. Ct. App. 2006) ("Tenn[essee] Code Ann[otated section] 36-1-113(g)(2) does not require substantial compliance with a permanency plan's 'desired outcome[s],' rather it requires substantial

compliance with a plan's statement of responsibilities, i.e., the actions required to be taken by the parent or parents."); *cf. **In re Eddie F.***, No. E2016-00547-COA-R3-PT, 2016 WL 7029285, at *6 (Tenn. Ct. App. Dec. 2, 2016), app. denied (Tenn. Mar. 2, 2017) ("Although [m]other certainly failed to comply with some requirements of the permanency plan, we cannot agree that [m]other's relapse 'undid' all of her previous and subsequent attempts to substantially comply with the requirements of her permanency plans.").

Here, Mother's behavior over the approximately two years leading to trial shows a general lack of effort on Mother's part. DCS workers consistently testified that Mother was difficult to contact to provide assistance in working the plan. Mother repeatedly began programs or services, only to stop her involvement prior to completion. Although the permanency plan makes clear that Mother's mental health and substance abuse were among the core issues in the permanency plan, Mother failed to make substantial effort to attend inpatient or outpatient treatment. Mother blamed this failure on medical problems, deaths in the family, miscommunication, and waiting lists. Mother admitted, however, that at a certain point, she stopped working with service providers and "didn't really deal with it." With regard to an inpatient drug and alcohol treatment program, Mother likewise testified that she "just really ha[s]n't been thinking about it right here lately." As such, Mother's behavior over the course of the more than two years that DCS has most recently been involved with this case illustrates a pattern where Mother makes little to no effort to complete the requirements under the plan, always laying the blame elsewhere. Thus, this is simply not the case wherein a parent makes considerable effort to work a permanency plan, only to fail to meet the desired outcomes of the plan due to a relapse near to the time of trial. *See **In re Zane W.***, No. E2016-02224-COA-R3-PT, 2017 WL 2875924, at *12 (Tenn. Ct. App. July 6, 2017) (reversing the trial court's finding with regard to substantial non-compliance with permanency plans, where mother made effort to complete the plan's requirements for two years, including attending required therapy, only to relapse shortly before trial). The trial court's finding that this ground had been proven by clear and convincing evidence is therefore affirmed.

### Persistence of Conditions

The trial court also based the termination of Mother's parental rights on persistence of conditions. Persistence of conditions requires the trial court to find, by clear and convincing evidence, that:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the

child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at any early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3).

"A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008) (citing *In re T.S. & M.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000)). The failure to remedy the conditions which led to the removal need not be willful. *In re T.S. & M.S.*, 2000 WL 964775, at *6 (citing *State Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990)). "Where . . . efforts to provide help to improve the parenting ability, offered over a long period of time, have proved ineffective, the conclusion is that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *Id.* The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 461675, at *20 (Tenn. Ct. App. Oct. 13, 2008) (quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008)).

Here, there is no dispute that the children were adjudicated dependent and neglected and had been removed from Mother's home for six months prior to the filing of the termination petition. With regard to this ground, the trial court found that three conditions led to the removal of the child: (1) "unaddressed drug and alcohol issues"; (2) "unaddressed mental health issues"; and (3) a "home environment [that] remains inappropriate for children." The trial court found that these conditions had not been remedied and were unlikely to be remedied in the near future so as to allow the return of the children to Mother. The record on appeal supports the trial court's findings.

Here, as discussed above, the permanency plan created by DCS and agreed to by Mother illustrates that mental health, drug, and environmental issues were central to Mother's ability to be reunited with her children. Unfortunately, in the more than two years since DCS most recently became involved with the family, Mother has made little

- 16 -

to no progress toward meeting these goals. Mother testified at trial that her mental health has suffered due to recent family losses. While we are certainly sympathetic to the problems that Mother has faced, her children simply cannot return to her until she can demonstrate stability and a desire to make improvements. Rather than demonstrate improvement, however, Mother testified that she utilized illegal drugs to deal with the stress and grief caused by her family losses and that she has recently chosen not to "deal" with the service providers referred by DCS or to really contemplate seeking the intensive inpatient treatment that was recommended.

In addition, while Mother testified that she was making improvements to her home, she admitted that even she was unable to live in the home full-time in the summer of 2016 because it lacked electricity. As of the date of trial, the home still had no working electricity. Moreover, Mother's failure to maintain contact with DCS workers and make herself available for home visits means that DCS was unable to determine if Mother's recent efforts have in fact improved the home. As late as September 2016, however, a DCS worker testified that the home was still cluttered and infested with bugs. Given that little to no improvements took place while DCS was able to make home visits, we are reluctant to credit Mother's testimony that the home has now improved to a point that the children may safely return. Under these circumstances, it appears that the conditions that led to the children's removal, specifically Mother's unaddressed drug and mental health issues and the environmental concerns of her home, have not been sufficiently addressed, nor are they likely to be addressed, so as to allow reunification of the family at an early date. Moreover, although there has been some instability in the children's placement previously, the record establishes that the children are now in a safe and stable home, placed with a family that wants to adopt the children. The children's therapists both testified that stability is integral to the children's progress. Mother's unaddressed issues show that, while her love for the children has not waivered, she simply cannot provide the type of stability necessary for her children. Thus, maintaining the relationship with Mother "diminishes the child's chances of early integration into a safe, stable and permanent home." Tenn. Code Ann. § 36-1-113(g)(3). The trial court's finding that clear and convincing evidence supports this ground for termination is therefore affirmed.

**Best Interest**

When at least one ground for termination of parental rights has been established, the petitioner must then prove by clear and convincing evidence that termination of the parent's rights is in the child's best interest. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). When a parent has been found to be unfit (upon establishment of ground(s) for termination of parental rights), the interests of parent and child diverge. *In re Audrey S.*, 182 S.W.3d at 877. The focus shifts to the child's best interest. *Id*. Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest. *Id*. However, when the interests of the parent and

the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child. Tenn. Code Ann. § 36-1-101(d). Further, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective." ***Moody***, 171 S.W.3d at 194.

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case. These factors include, but are not limited to, the following:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to affect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). This Court has noted that, "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." ***In re M. A. R.***, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Depending on the circumstances of an individual case, the consideration of a single factor

or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S.*, 182 S.W.3d at 877. As explained by this Court:

> Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*In re Audrey S.*, 182 S .W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194).

The trial court made detailed findings of fact to support its determination that termination of Mother's parental rights was in the children's best interest, including discussion of the testimony provided by DCS regarding Mother's progress and the testimony of the children's therapists and foster mother regarding their progress since removal. Based upon these findings, the trial court made the following pronouncements:

> 43. It is in the children's best interests for termination to be granted as to [Mother], because she has not made changes in her conduct or circumstances that would make it safe for the children to go home. The Court finds that it is not safe for the children to return to [Mother] at this time. [Mother] has not completed the recommendations of her assessments. She has not completed alcohol and drug counseling. She has not participated in mental health counseling. Her home is not environmentally safe.
> 44. It is in the children's best interests for termination to be granted as to [Mother], because she has not made lasting changes in her lifestyle or conduct after reasonable efforts by the state to help, so that lasting change does not appear possible. The Court specifically finds that [DCS] has made reasonable efforts in this cause to assist [Mother] in addressing her substance abuse issues, mental health concerns, and housing issues, all to no avail.
> 45. The Court finds that the children do have a meaningful relationship with [Mother].
> 46. It is in the children's best interests for termination to be granted as to [Mother], because changing caregivers at this stage of their lives will have a detrimental effect on them. The Court specifically finds that both of the children's therapists testified that the children are in need of stability, consistency and permanency. This is important to their overall wellbeing. The Court further finds that the children have attained stability in the

[foster] home, in that, with the exception of a three (3) month period of time, they have lived in this home for the last two (2) years.

47. It is in the children's best interests for termination to be granted as to [Mother], because she has neglected the children and other children who are their siblings.

48. It is in the children's best interests for termination to be granted as to Respondent, because there is crime in her home. The Court specifically finds that [Mother] is abusing illegal drugs, raising concerns for the illegal activity that is ongoing in her home and life.

49. [] The Court finds that it is in the children's best interests for termination to be granted as to [Mother], because she abuses illegal drugs, rendering her consistently unable to care for the children [in a] safe and stable manner. [Mother] has continuously struggled with drug abuse during the pendency of the dependent and neglect proceedings over the past two (2) years. She has attempted multiple drug treatment programs and has never completed any of them. She acknowledged in her testimony that she needs drug treatment. She tested positive for illegal drugs on a drug screen by DCS as recently as December, 2016, and when asked by the [DCS] during her cross-examination if she would pass a drug screen today, she acknowledged that she did not know and that she had used illegal drugs as recently as three (3) weeks ago. She acknowledged that she uses illegal drugs when she is depressed or overwhelmed, although she denied the categorization of her drug use as "self-medicating." The Court finds that [M]other's continued drug use does render her consistently unable to care for the children in a safe and stable manner and this factor weighs in favor of termination of [Mother]'s parental rights.

50. It is in the children's best interests for termination to be granted as to [Mother] because her mental and emotional state would be detrimental to the children and would prevent her from effectively parenting the children. The Court finds that [Mother] needs to be stable to meet not only her needs but the needs of the children. Up to this point, she has not demonstrated that she is even able to meet her own mental health needs.

51. It is in the children's best interests for termination to be granted as to [Mother] because she has not paid child support consistently.

52. It is in the children's best interests for termination to be granted as to [Mother], because she has shown little or no interest in the welfare of the children. The Court finds that, as to [Mother], she appears to be content with having only supervised visitation with the children and making no further steps towards getting the children home. While this may be acceptable to her, it is not acceptable for the children.

53. It is in the children's best interests for termination to be granted as to [Mother], because the children have established a strong bond with their foster parents, who wish to adopt them.

The record on appeal generally supports the trial court's findings with regard to the best interests of the children. As the trial court found, testimony from both Mother and a service provider who supervised visitation indicated that Mother and the children had a close and loving bond, which has been maintained through Mother's largely consistent visitation. *See* Tenn. Code Ann. § 36-1-113(i)(3) & (4). As such, these factors do not militate in favor of termination. Although the trial court also found that Mother's failure to pay child support favored termination, this factor is less certain, as the record is unclear as to Mother's ability to pay support. *See* Tenn. Code Ann. § 36-1-113(i)(9).

Other factors, however, strongly favor termination. Here, Mother has consistently admitted to abusing drugs to combat her mental health issues, rather than seeking and completing mental health treatment. *See* Tenn. Code Ann. § 36-1-113(i)(8). Because Mother has inconsistently sought appropriate treatment, it is not clear that Mother would maintain the mental health treatment that both of the children's therapists testified was necessary to their continued progress. Changing caretakers therefore is likely to have detrimental effect on the children. *See* Tenn. Code Ann. § 36-1-113(i)(5).

The home in which Mother lives is also not appropriate for the children to return. *See* Tenn. Code Ann. § 36-1-113(i)(7). When DCS workers were allowed in Mother's home, they observed that it remained cluttered and bug-infested even years after the children were removed. Mother admitted at trial that the house lacked electricity, making her unable to stay in the home for a time. Clearly, Mother's inability or refusal to maintain drug-free and to establish a suitable living space for the children illustrates her failure to make an adjustment of circumstances so as to make it safe for the children to return to her care. *See* Tenn. Code Ann. § 36-1-113(i)(1). Finally, although Mother testified that she was currently taking parenting classes in order to meet the requirements of the parenting plan, Mother's effort in the week before trial simply does not show that she has made a lasting adjustment or that she is likely to do so. *See* Tenn. Code Ann. § 36-1-113(i)(2). Indeed, even with the serious consequences of the termination of her relationship with her children on the horizon, Mother chose to use illegal drugs, thereby substantially decreasing the likelihood that they would be returned to her at an early date. Finally, although the children's placement has previously been disrupted, the record shows that their current foster home provides the children with the best chance of establishing stability and maintaining their progress. Based upon the trial court's detailed findings above, we agree that DCS established clear and convincing evidence that termination of Mother's parental rights was in the children's best interests.

**Conclusion**

The judgment of the Juvenile Court of Washington County terminating Mother's parental rights to her two children is affirmed and this cause is remanded to the trial court

for further proceedings as are necessary and consistent with this Opinion. Costs of this appeal are taxed to Appellant Felicia A., for which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE